Reinhard, J.
The appellee sued the appellant for libel, and recovered a judgment against him. The court overruled a demurrer to the complaint, and this ruling is the only error assigned.
The complaint, by way of inducement, states that appellee, as the bishop of the Roman Catholic Church for the diocese of Fort Wayne, was, and had been for a long time prior to the 12th day of January, 1894, the owner in fee-simple of a certain orphans’ home or asylum, located near Fort Wayne, Indiana, which was used for the instruction, care, protection and well being, physically, morally and religiously, of the poor and destitute orphan children of the Catholic Church, and such other destitute children as might solicit a home and protection therein; that as such owner of said asylum, and as such bishop of said diocese, he had for a long time, *219 and still has the supervision, management and control of said asylum; that as such bishop it was his duty to select and appoint a priest to officiate in, and instruct morally and religiously the inmates of said asylum, and to see to it that he was pure and virtuous, and that he would observe as such, in connection with said asylum, all the laws of decency, decorum and virtue; that it was the duty of the appellee, as such bishop and superintendent of said asylum to appoint one of the sisters of said church, of known purity of character, exalted piety, experience and capacity, to properly watch "over, instruct and protect the inmates of said asylum in the ways of honesty, morality and virtue, which appointees it was, and is the duty of the appellee, as such bishop and superintendent, to remove if in any way unfaithful or negligent in the discharge of their respective duties; that the appellee is, in fact, as such bishop and superintendent, responsible for the actions and conduct of all the subordinate employes in and about said asylum; that if any of such employes fail or neglect to discharge his or her duty, it becomes his duty to remove said delinquent.
The complaint then alleges that the appellant is the proprietor of a certain newspaper—stating its name and where published. It then avers that, with the view, and for the purpose of exposing the appellee, personally, and ■as such bishop and superintendent of said asylum, to the ridicule, hatred and ill-will of all good people in Fort Wayne and vicinity, and to destroy the high standing and usefulness of said asylum, and to injure all persons concerned in or connected with its management and government, the appellant did, on the day, etc., unlawfully and maliciously print, publish and circulate in said paper, of and concerning the appellee, as such bishop and superintendent of said asylum, and of and concerning said asylum, and of and concerning all who were con *220 nected with the government and management thereof, and to canse it to believed in said city and its vicinity, that the appellee, as such bishop and superintendent, had, in violation of his duty as such, appointed an unfit, unchaste, libidinous and impious priest to look after, protect and have charge of the young and inexperienced females of said asylum, and that he appointed cruel, incompetent, immoral and unchaste females to co-operate with such unchaste and incompetent priest, in debauching such female inmates of said asylum, the following false, malicious and libelous article, in the words following, that is to say : Here the article is set out in full. Then follows the conclusion.
The alleged libelous article is as follows:
“Dungeons. Our Roman Catholic Orphans’ Asylum Contains Them. Startling Revelations oe a Young Lady.. Incarcerated by a Priest eor Non Compliance.
“Much has been said concerning dungeons and those who have occupied them, because of disobeying the Jesuit or refusing him certain liberties, but the skeptical have doubted while the Romish clergy denied it. We beg permission to relate a story which occurred not long since in Fort Wayne. As nearly every one is aware, there is a Roman Catholic orphans’ home on the northern boundary of our city. A young man living in that vicinity relates that as he passed daily to his employment he had observed a young lady, aged about seventeen years, at an upper window. For some time he saw nothing in that to excite his curiosity, and consequently gave it little consideration. As time passed their familiarity became closer and they spoke to each other. At no time, however, did the young man entertain the intention, or even desire, to approach closer than the walk he trod to and fro to work and home. The young lady beckoned *221 him, finally, to advance to the home, but he realized he had no business on private property and refused. The beckoning became so earnest, however, that the young gentleman decided to ascertain the cause. He ventured to the building and was surprised to know that it was the desire of the young girl to quit the place. She was asked if she was not kindly treated and answered most emphatically, No! She volunteered the information that she had been shut in the dungeon for a week and was compelled to subsist on bread and water. Why?
“Now comes the answer that should arouse the furious indignation of every person who upholds decency or even modesty. This young woman, probably an orphan, for aught she knows to the contrary, bound by law to the Roman Catholic church, where she is supposed to be taught morals at least, if not religion, declared that a priest made a lewd proposition to her, and, because she spurned it, was placed in a dungeon. Behold a Roman Catholic priest, who poses in the light of the nineteenth •century as a man of God, attempting to lead astray a mere child, and that in a house of worship, as they call it, because it is exempt from taxation.
“The American Eagle is fearless in saying it can. produce the name of the young lady and the young gentleman in question. For their sake they are withheld. Now, you doubting Thomases and you who uphold this shameful proceeding by declaring there is but one church, trump up some other excuse for your indolence or idolatry. We have just begun in exposing the corruption and crime that exists in the Roman Catholic churches in Fort Wayne, and shall not rest until every convent, nunnery and orphans’ home or other such house peculiar to that sect is turned inside out for public inspection.”
It is earnestly contended, in argument by counsel for *222 appellant, that the above publication is not libelous, and especially not as to the appellee. Any words published of and concerning the plaintiff are libelous when they are such as tend to degrade, disgrace or injure his character or reputation. Indianapolis Journal Newspaper Co. v. Pugh, 6 Ind. App. 510.
The demurrer admits every fact that is well pleaded. Indianapolis Journal Newspaper Co. v. Pugh, supra; Ryckman v. Delavan, 25 Wend. 186.
It is therefore admitted by the demurrer that the appellee, as bishop of the Roman Catholic church of Fort Wayne, was the owner in fee simple of the asylum; that he was its superintendent, and responsible for its proper management and government, and for the appointment of proper and suitable employes to guard, instruct and educate the children confided, to its care; it admits that, it was the appellee’s duty to know that the employes or appointees were fit and competent persons, and that they performed their duties faithfully; that the most active vigilance was required of him in this regard to see that no unfit or improper person was employed or permitted to enter the asylum; it admits that the article was published of and concerning the appellee as the responsible head, owner and superintendent of the institution, and that the article was published of and concerning the asylum and all persons connected with its government.
It can not be successfully contended that these facts were unnecessarily averred, and therefore not well pleaded. That the publication is defamatory and libelous of some person or persons, unless justified, is certainly beyond controversy. It can not be claimed, with any degree of plausibility, that the perpetrators of such a nefarious act as that charged would not merit and probably incur the obloquy and contempt of every right, thinking citizen of the community. The publication *223 charges that a young woman, probably an orphan, admitted into this institution to be taught morals and religion, has, according to her own statements, been systematically pursued by one who had been.set over her in loco parentis, in an attempt to induce her to yield her body to his lustful desires, and when she spurned his advances she was locked up in a dungeon and fed upon bread and water for a week, presumably to coerce her to do that which she refused to do in response to gentler means. Whoever is implicated in such diabolical exercise of power over a helpless female (not to say a child ) deserves the odium and condemnation, if not the “furh ous indignation,” as the article insists, “of every person who upholds decency or even modesty,” and that the publication was intended to have this effect, is plainly apparent upon the face of the same.
While it is doubtless true that naturally most of the odium would fall heaviest upon him who is directly connected with the affair, it does not follow that others necessarily implicated are not also injuriously affected, though it may be in a smaller degree. The charge is broad and sweeping in its application. It implicates not only the priest, who sought to seduce this girl, but it reflects directly upon the orphan asylum and its management, if not upon all the Roman Catholic churches and institutions in Fort Wayne. It plainly insinuates in the closing words, not only that corruption and crime exist, of which a specific instance has been given, but that every “convent, nunnery and orphans’ home, or other such houses peculiar to that sect, ’ ’ is tainted with similar corruption and crime, which the writer promises to expose by turning these places inside out for public inspection.
If these charges are true, they are a sad commentary upon the management of the institution in which the *224 acts were committed, as well as upon that of every "convent,” "nunnery,” "orphans’ home” and other places of the kind connected with the Roman Catholic church of Fort Wayne, of which it is averred the appellee is the superintendent and head, and for the control and conduct of which he is responsible. Surely no parent, guardian or other person having control of children would desire to commit his sons and daughters or wards to the training of such persons or such an institution, and any one reading and believing the article, who is familiar with the appellee’s connection with these places, would naturally and justly ascribe a large portion of the blame to the bishop, whose duty it is to see and know that proper management and government prevail.
In former times the rule prevailed that the construction of slanderous or libelous language would be materially affected by the position in life of the person of whom the language was spoken or written. Thus some words concerning "great men of the realm” were held actionable which would not have been so held when published concerning private persons. Language used to defame ‘ 'great men” was called "scandallum magnatum.” But no such distinction of persons is known in the United States. Townshend Sl. & Lib. (4th ed.), p. 127. There is, however, a distinction between words published of an individual as such, and words published of one in a certain capacity or official character. Thus, language may not be libellous when published of a person as a mere individual, while the same language may be actionable when spoken of such person in some special character or relation. . It is the office of the inducement in a declaration for slander, to show that the plaintiff is the person referred to. Under our code it is not necessary in an action for'libel or slander to state extrinsic facts connecting the plaintiff with the defamatory matter as the per *225 son to whom the words were applied. It is sufficient if there be an averment generally that' such matter was published of and concerning the plaintiff. If the allegation be denied, it then devolves on the plaintiff to prove that the defamatory words were published or spoken of him. R. S. 1894, section 375 (R. S. 1881, section 372.)
Of course this statute does not dispense with the necessity of averring extrinsic facts to show the meaning of ambiguous language when such language is not defamatory upon its face. But when the words themselves are actionable, if they were applicable to the plaintiff, an averment that thejr were published of him is sufficient as an inducement. Townshend Lib. and Sl. (4th ed.), p. 540, 541.
It certainly can not be true that the publication of such matter by a newspaper is privileged. It has long been the rule that publications of this character can not be excused on the ground that they are matters of such public interest as to properly form the subject of comment in a newspaper. “Nor is it lawful to publish anything defamatory of a private society or religious institution, as in the case of the Scorton nunnery, where the defendant was convicted of publishing a libel with intent to defame and vilify a certain religious order or community called ‘Scorton Nunnery,’ and certain persons (naming them), being the Lady Abbess and nuns of the said order, and certain other persons being the chaplains thereof.” Folkard’s Starkie Sl. and Lib., margin p. 237.
It is true the words must refer to some ascertained or .ascertainable person, and that person must be the plaintiff. Odgers on Lib. and Sl., p. 127. But where the words •are capable of having a special application to the plaint *226 iff, and there is an averment-that they were published of him, the action will lie, although at first sight the words used may appear only to apply to a class of individuals and not to be specially defamatory of any particular member of that class. Odgers on Lib. and Sl., pages 128, 129.
Filed Nov. 20, 1894.
Without further prolonging this opinion, it is sufficient to say that in our view the complaint states a cause of action. This is all that we are called upon to decide. The court did not err in overruling the demurrer.
Judgment affirmed.